Slip Op. 19–106

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CHINA STEEL CORP., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant, | : |
| | : |
| and | : |
| | : |
| ARCELORMITTAL USA LLC, NUCOR CORP., | : |
| and SSAB ENTERPRISES LLC, | : |
| | : |
| Defendant-Intervenors. | : |

Before: Richard K. Eaton, Judge

Court No. 17-00152

**PUBLIC VERSION**

## <u>OPINION and ORDER</u>

[U.S. Department of Commerce's final determination is sustained, in part, and remanded.]

Dated:  August 6, 2019

*Jeffrey M. Winton*, Law Office of Jeffrey M. Winton PLLC, of Washington, DC, argued for Plaintiff.

*Vito S. Solitro*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant. With him on the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Tara K. Hogan*, Assistant Director. Of Counsel on the brief was *Paul Keith*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

*Paul C. Rosenthal*, Kelley Drye & Warren, LLP, of Washington, DC, argued for Defendant-Intervenor ArcelorMittal USA LLC. With him on the brief were *R. Alan Luberda*, *David C. Smith, Jr.*, *Melissa M. Brewer*, *Joshua R. Morey*, and *Heather N. Doherty*.

*Alan H. Price*, *Tessa V. Capeloto*, *Adam M. Teslik*, *Christopher B. Weld*, *Laura El-Sabaawi*, *Maureen E. Thorson*, *Stephanie M. Bell*, and *Timothy C. Brightbill*, Wiley Rein LLP, of Washington, DC, for Defendant-Intervenor, Nucor Corporation.

*Roger B. Schagrin*, *Christopher T. Cloutier*, *Elizabeth J. Drake*, *John W. Bohn*, and *Paul W. Jameson*, Schagrin Associates, of Washington, DC, for Defendant-Intervenor SSAB Enterprises LLC.

Eaton, Judge: Plaintiff China Steel Corporation ("Plaintiff" or "China Steel") moves for judgment on the agency record, challenging the United States Department of Commerce's ("Commerce" or the "Department") amended final determination in the antidumping investigation of certain carbon and alloy steel cut-to-length plate from Taiwan. *See Certain Carbon and Alloy Steel Cut-To-Length Plate From Taiwan*, 82 Fed. Reg. 16,372 (Dep't Commerce Apr. 4, 2017) ("Final Determination"), *amended by Certain Carbon and Alloy Steel Cut-To-Length Plate From Austria, Belg., Fr., the Fed. Rep. of Ger., It., Japan, the Rep. of Korea, and Taiwan*, 82 Fed. Reg. 24,096 (Dep't Commerce May 25, 2017) ("Amended Final Determination") and accompanying Issues and Dec. Mem. (Mar. 29, 2017), P.R. 427 ("Final IDM"). The court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(i) (2012) and 28 U.S.C. § 1581(c) (2012).

On April 8, 2016, domestic producers ArcelorMittal USA LLC ("ArcelorMittal" or "Petitioner"), Nucor Corporation, and SSAB Enterprises, LLC each filed an antidumping duty petition covering steel from various countries, including Taiwan. Thereafter, on May 5, 2016, Commerce published the notice of initiation of its less-than-fair-value investigation. *See Certain Carbon and Alloy Steel Cut-To-Length Plate From Austria, Belg., Braz., Fr., the Fed. Rep. of Ger., It., Japan, the Rep. of Korea, the People's Rep. of China, S. Afr., Taiwan, and the Rep. of Turk.*, 81 Fed. Reg. 27,089 (Dep't Commerce May 5, 2016) ("Initiation of Investigation"). The scope of the investigation covered products including "certain carbon and alloy steel hot-rolled or forged flat plate products not in coils, whether or not painted, varnished, or coated with plastics or other non-metallic substances (cut-to-length plate)." Final Determination, 82 Fed. Reg. at 16,374, App. I.

On June 7, 2016, the Department limited the respondents selected for individual investigation to two mandatory respondents: Plaintiff China Steel, and Shang Chen Steel Co., Ltd. ("Shang Chen"). *See Certain Carbon and Alloy Steel Cut-to-Length Plate From Taiwan*, 81 Fed. Reg. 79,420 (Dep't Commerce Nov. 14, 2016) ("Preliminary Determination"); Respondent Selection Mem. (June 7, 2016), P.R. 88 at 5.

China Steel is a Taiwanese producer and exporter of the subject steel plate, and first objects both to Commerce's application of adverse facts available ("AFA"),[1] and to Commerce's rejection of a supplemental questionnaire response containing unrequested data. Next, Plaintiff contends that Commerce erred when it applied AFA to some of the company's cost of production data and when it used that AFA-adjusted data in its difference-in-merchandise ("DIFMER") adjustment to normal value. Plaintiff also claims entitlement to a post-sale home-market price adjustment. Finally, it argues that Commerce's decision was unfairly prejudged by a conflict of interest on the part of the Secretary of the Department, Wilbur Ross, who was formerly associated with Petitioner and Defendant-Intervenor ArcelorMittal. *See* Pl.'s Rev. Br. Supp. Mot. J. Agency R., ECF No. 65 ("Pl.'s Br."); *see also* Pl.'s Reply, ECF No. 61.

Because Commerce erred when it based part of its DIFMER analysis, and thus its subsequent adjustment, on AFA-adjusted data, the Amended Final Determination is remanded.

---

[1]     The statute provides that Commerce shall use facts available "[i]f . . . necessary information is not available on the record, or . . . an interested party or any other person . . . withholds information that has been requested by [Commerce]" or "significantly impedes a proceeding." 19 U.S.C. § 1677e(a)(1)-(2)(A), (C). Facts available may also be used if the information provided "cannot be verified" and is therefore unreliable. *Id.* § 1677e(a)(2)(D). Commerce may only use adverse inferences when "selecting from among the facts otherwise available" if it finds that a party has "failed to cooperate by not acting to the best of its ability to comply with a request for information." *Id.* § 1677e(b)(1)(A).

Since Plaintiff's other arguments lack merit, Commerce's determination, as to the remaining

issues, is sustained.

## BACKGROUND

Where goods are being sold at less than fair value, Commerce imposes an antidumping

duty "equal to the amount by which the normal value exceeds the export price (or the constructed

export price) for the merchandise."[2] 19 U.S.C. § 1673.

During this investigation, the Department compared

> all products produced and sold by China Steel in Taiwan during the [period of
> investigation] that fit the description in the "Scope of Investigation" section of the
> accompanying *Federal Register* notice to be foreign like products for purposes of
> determining appropriate product comparisons to U.S. sales. We compared U.S.
> sales to sales made in the home market, where appropriate. Where there were no
> sales of identical merchandise in the home market made in the ordinary course of
> trade to compare to U.S. sales, we compared U.S. sales to sales of the most similar
> foreign like product made in the ordinary course of trade.

Final IDM at 19. When appropriate, Commerce makes various adjustments to normal value,

including the difference-in-merchandise ("DIFMER") adjustment for physical variations between

products. *See* 19 U.S.C. § 1677b(a)(6)(C)(ii); 19 C.F.R. § 351.411 (2017).

Normal value, in the context of a market economy country[3] such as Taiwan, is generally

based on the prices of sales in the home market. *See* 19 U.S.C. § 1677b(a)(1)(B)(i). Commerce

---

[2]     Commerce uses several methods to compare normal value and export price in less-than-fair-value investigations. *See* 19 C.F.R. § 351.414(b) (2017) (listing methods). In this case, the Department used the "average-to-transaction" method. *See* 19 C.F.R. § 351.414(b)(3) ("The 'average-to-transaction' method involves a comparison of the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise."); Final IDM at 18 ("[F]or the [F]inal [D]etermination, the Department is applying the average-to-transaction method to all of China Steel's U.S. sales to calculate the weighted-average dumping margin for China Steel.").

[3]     In contrast, a "nonmarket economy country" is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that

disregards home-market sales that were made at less than the cost of production, and bases normal

value on the remaining sales, or, if none remain, the merchandise's constructed value. *Id.*

§ 1677b(b)(1).

In this investigation, after reviewing the company's cost of production information,

Commerce eventually concluded that China Steel's home-market sales were a suitable basis for

normal value. *See* Final IDM at 20 ("[W]e used home market sales as the basis for [normal value]

for China Steel."). Commerce, however, calculated normal value employing AFA for some of

China Steel's cost of production data. Further, Commerce rejected China Steel's preferred version

of its cost of production database. Thereafter, Commerce determined that it had made a ministerial

error by not using AFA-adjusted data as the basis of its DIFMER adjustment to normal value. Its

correction of that claimed error resulted in an increased weighted-average dumping margin for

China Steel.

## I.       Commerce's Preliminary Determination

Commerce issued its initial questionnaire on June 9, 2016. *See* China Steel Quest. (June 9,

2016), P.R. 96. In its Section D (cost of production) questionnaire response, Plaintiff provided its

cost reporting method and cost data file, denominated as COP1. *See* China Steel Sec. D Narrative

Resp. (July 28, 2016), P.R. 195 at 19-21; China Steel Sec. D Exs. (July 28, 2016), P.R. 198, Apps.

D-19, D-20.

---

sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C.
§ 1677(18)(A). When the merchandise in question is exported from a nonmarket economy country,
Commerce calculates the normal value of the subject merchandise based on the values of the
factors of production, adding "an amount for general expenses and profit plus the cost of
containers, coverings, and other expenses." *Id.* § 1677b(c)(1)(B).

The Department identified several errors in China Steel's COP1 database. *See* Prelim. Dec.
Mem. (Nov. 4, 2016), P.R. 358 at 16 ("Prelim. Dec. Mem."). Accordingly, on September 16, 2016,
it issued a supplemental questionnaire to Plaintiff asking for additional information concerning
Plaintiff's Section D response.[4] Sec. D Suppl. Quest. (Sept. 16, 2016), P.R. 298 ("Suppl.
Quest. I").

China Steel filed its Section D supplemental response on October 11, 2016. *See* China Steel
Suppl. Quest. Sec. D Resp. (Oct. 11, 2016), P.R. 324 ("First COP2 Resp."). In addition to
providing the information specifically requested by the Department, however, it made additional,
unrequested, revisions to its cost data file (denominated as COP2).[5] Prelim. Dec. Mem. at 16
(noting that Plaintiff's additional revisions "were not made in response to a supplemental
questionnaire or otherwise solicited by the Department").

---

[4]     Following several requests for extensions of time, Commerce ultimately amended
the deadline for Plaintiff's Section D response from September 30, 2016 to October 10, 2016. *See,
e.g.*, Letter from Erin Kearney to Jeffrey M. Winton, Extension of Time to Submit Supplemental
Questionnaire Responses (Sept. 28, 2016), P.R. 312. Since October 10, 2016 was a non-business
day, pursuant to Commerce's regulations, it was permissible for Plaintiff to submit its filing on the
following day. *See* 19 C.F.R. § 351.303(b).

[5]     These revisions were primarily comprised of China Steel's claimed discovery of,
and attempt to correct, errors in "the coding of product-matching control numbers . . . in [its] July
28 [COP1] submission, particularly in the reporting of the 'Quality' characteristic." First COP2
Resp. at 1.

"Quality code" refers to one of the product characteristics, assigned by Commerce, that
respondents use for reporting cost of production data in the course of an investigation. *See* Letter
from Robert James to Jeffrey M. Winton, Product Characteristics for the Antidumping Duty
Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate from Taiwan (June 14, 2016),
P.R. 111. These codes are used to define product-matching control numbers, called CONNUMs.
"A 'CONNUM' is a control number assigned to materially-identical products to distinguish them
from non-identical, i.e., similar, products." *Eregli Demir ve Celik Fabrikalari T.A.S v. United
States*, 42 CIT __, __, 308 F. Supp. 3d 1297, 1321 n.34 (2018) (citation omitted).

In its Preliminary Determination, Commerce found all of China Steel's reported cost data, "unreliable for use." Prelim. Dec. Mem. at 16. The statute provides that Commerce shall use facts available "[i]f . . . necessary information is not available on the record, or . . . an interested party or any other person . . . withholds information that has been requested by [Commerce]" or "significantly impedes a proceeding . . . ." 19 U.S.C. § 1677e(a)(1)-(2)(A), (C). Here, Commerce found that China Steel's changes, between COP1 and COP2, to certain product-matching control numbers ("CONNUMs") affected the calculation of the cost of production and rendered all of China Steel's reported cost information unusable. *See* Prelim. Dec. Mem. at 16 (emphasis added) ("[T]he Department preliminarily finds that China Steel failed to provide requested information in the form and manner requested and by the deadlines established by the Department. By revising its costs so extensively and significantly, and by doing so *in such close proximity to the statutory date*[6] for the [P]reliminary [D]etermination, China Steel has also significantly impeded the proceeding.").

Where Commerce determines that the use of facts available is warranted, it must make the requisite additional finding that a party has "failed to cooperate by not acting to the best of its ability to comply with a request for information" before it may use an adverse inference when "selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b)(1)(A). In the Preliminary Determination, the Department found that because China Steel "fail[ed] to explain the extensive, significant, and unsolicited changes to its cost database," an adverse inference when selecting from among the facts available was warranted. *See* Prelim. Dec. Mem. at 17. Applying

---

6       China Steel's supplemental questionnaire response was submitted on October 11, 2016. The Preliminary Determination was issued on November 14, 2016.

"total AFA,"[7] the Department preliminarily assigned China Steel a margin of 28 percent, which

constituted "the highest calculated dumping margin [assigned] in the investigation." Prelim. Dec.

Mem. at 8, 18-19; *see* Preliminary Determination, 81 Fed. Reg. at 79,420 ("Because mandatory

respondent China Steel failed to cooperate to the best of its ability in responding to the

Department's questionnaires, we preliminarily determine to use adverse facts available (AFA)

with respect to this respondent.").[8] In other words, in the Preliminary Determination, Commerce

---

[7]        Since the 1994 amendments to section 1677e, Commerce has adopted the practice,
under certain circumstances, of using what it calls "total adverse facts available" when determining
dumping margins. "Total adverse facts available" is not defined by statute or agency regulation.
Commerce has used "total adverse facts available" administratively "to refer to Commerce's
application of adverse facts available not only to the facts pertaining to specific sales for which
information was not provided, but to the facts respecting all of respondents' sales encompassed by
the relevant antidumping duty order." *Mukand, Ltd. v. United States*, 37 CIT __, __, 2013 WL
1339399, at *7 (Mar. 25, 2013) (not reported in Federal Supplement), *aff'd*, 767 F.3d 1300 (Fed.
Cir. 2014) (citation omitted).

       This Court has sustained Commerce's use of total adverse facts available in certain tightly
defined circumstances, *e.g.*, (1) the record contained no usable information for core components
of Commerce's dumping analysis, or (2) substantial evidence showed that the respondent was
egregious in its failure or refusal to comply with Commerce's requests for information. *See, e.g.*,
*Mukand*, 37 CIT at __, 2013 WL 1339399, at *7 (citations omitted); *Papierfabrik August Koehler
Se v. United States*, 38 CIT __, __, 7 F. Supp. 3d 1304, 1314 (2014). Where, on the other hand,
some of the information could be used, or the deficiency was only "with respect to a discrete
category of information," the use of "partial adverse facts available" is directed by the statute.
*Foshan Shunde Yongjian Housewares & Hardware Co. v. United States*, 35 CIT 1398, 1416, 2011
WL 4829947, at *14 (Oct. 12, 2011); *see also Nat'l Nail Corp. v. United States*, 43 CIT __, __,
2019 WL 2537931, at *14 (June 12, 2019) (not reported in Federal Supplement) ("[I]n order to
apply 'total adverse facts available,' Commerce must first find, based on the record, that the use
of facts available is warranted with respect to all requested information.").

[8]        As noted, the resulting preliminary antidumping duty rate for China Steel was 28
percent. Preliminary Determination, 81 Fed. Reg. at 79,421. This number represented mandatory
respondent Shang Chen's transaction-specific margin. Prelim. Dec. Mem. at 19. In the Preliminary
Determination, however, Commerce calculated a weighted-average dumping margin of 3.51
percent for Shang Chen, and assigned this rate to all other, non-mandatory respondents. *See*
Preliminary Determination, 81 Fed. Reg. at 79,421. In the Amended Final Determination, the "all
others" rate was the average of the two mandatory respondents' recalculated rates (now 75.42
percent for China Steel and 3.62 percent for Shang Chen), resulting in a weighted-average
dumping margin of 39.52 percent. Amended Final Determination, 82 Fed. Reg. at 24,098.

found that total AFA should be applied, thus using AFA not only for China Steel's costs of production, but also for its reported sales information. As a result, China Steel's preliminary antidumping duty rate was 28 percent. Preliminary Determination, 81 Fed. Reg. at 79,421.


II.        **Post-Preliminary Determination and Second Supplemental Questionnaire**

Although it applied total AFA to China Steel's products in the Preliminary Determination, Commerce stated that it "intend[ed] to issue a supplemental questionnaire after the [P]reliminary [D]etermination to provide China Steel with an opportunity to explain the changes made to its cost database." Prelim. Dec. Mem. at 17. In a supplemental questionnaire dated November 9, 2016, the Department did just that, and asked Plaintiff to explain its revised cost data file, COP2. Sec. D Suppl. Quest. (Nov. 14, 2016), P.R. 361 ("Suppl. Quest. II"). On November 30, 2016, Plaintiff provided the explanations concerning COP2, but also submitted additional changes to its data file. *See* China Steel Sec. D Suppl. Quest. Resp. (Nov. 30, 2016), P.R. 378 ("Rejected COP3 Resp."). These revisions—which, among other things, incorporated corrections to a computing error that overstated standard costs of production and resulted in an overstated "calculated total aggregate standard cost for all products"—were denominated as data file COP3. Pl.'s Br. 19; *see* Rejected COP3 Resp. at 2-7; Letter from Erin Kearney to Jeffrey M. Winton, Rejection of Unsolicited Database (Dec. 29, 2016), P.R. 395 ("Rejection of Unsolicited Database").

Commerce rejected COP3 as untimely new factual information, and instructed China Steel to resubmit its supplemental response with only an explanation as to the differences between COP1 and COP2. *See* Rejection of Unsolicited Database. Accordingly, the additional revisions contained in COP3 are not part of the record. China Steel complied and submitted its final, revised response

without the additional changes to the data file. *See* China Steel Sec. D Suppl. Quest. Resp. (Jan. 4,

2017), P.R. 398 ("Final COP2 Resp.").

Commerce then conducted its verification of China Steel's costs of production. *See* Cost

Verification Rep. (Feb. 9, 2017), P.R. 408. In the cost verification report, Commerce identified

new computer programming errors in COP2—the database it was attempting to verify—that

caused the costs of three CONNUMs[9] to be misstated, as well as an incorrect calculation of

weighted-average per-unit costs for a number of other CONNUMs.[10] Final IDM at 6-7.

### III.   Facts Available and Adverse Inferences in the Final Determination

Commerce issued its Final Determination on April 4, 2017, calculating a dumping margin

for China Steel of 6.95 percent, which Plaintiff found "not insanely punitive." Pl.'s Br. 26; *see*

Final Determination, 82 Fed. Reg. at 16,373. Commerce based its normal value calculation on

China Steel's home-market sales, after removing those products for which more than twenty

percent of home-market sales were made at less than the cost of production. Final IDM at 20, 23-

24.

Commerce's cost of production analysis, underlying its normal value calculation, was

based on China Steel's finalized COP2 database. *See* Final IDM at 6-7. Commerce used AFA for

---

[9]        In total, sixty-one of a total 143 CONNUMs were affected by errors. These sixty-
one included the three that Commerce singles out in its analysis. *See* Final COP2 Resp., P.R. 398,
C.R. 598 at 13-14; China Steel Cost Calculation Mem. (Mar. 29, 2017), P.R. 435, C.R. 662 at 1-2
("Cost Calculation Mem.").

[10]       Specifically, there was an incorrect calculation of weighted-average per-unit costs
for sixty-one CONNUMs. *See* Cost Calculation Mem. at 1-2.

China Steel's cost of production, its overall cost of manufacturing,[11] and certain of its U.S. sales.[12] Final IDM at 6-7. Further, Commerce determined that China Steel was not permitted post-sale price adjustments it sought to make for certain home-market sales, because the terms and conditions were not known by its customers at the time of sale. *See* Final IDM at 44-47.

Regarding cost of production, Commerce applied facts available to the affected CONNUMs based on the errors remaining in China Steel's COP2 database following verification. *See* Final IDM at 6-7. Further, Commerce determined that China Steel's reporting of inaccurate data amounted to a failure to cooperate to the best of its ability, and then drew an adverse inference for the purpose of calculating cost of production. *See* Final IDM at 6-7 ("Regarding the three

---

[11]     Commerce applied an adverse inference when it increased China Steel's total reported cost of manufacturing in COP2. Cost Calculation Mem. at 2; *see* Final IDM at 7. Commerce disregarded China Steel's own so-called "favorable variance adjustment," which the company had applied to account for the difference between its standard costs and actual costs of manufacturing and increased the total cost of manufacturing by [[   ]]. *See* Cost Calculation Mem. at 2; Final IDM at 7.

[12]     China Steel does not dispute Commerce's use of AFA for certain of the company's U.S. sales. At sales verification, which took place from December 11 to 15, 2016, Commerce asked for, and received, information from China Steel about how changes to its quality code data affected sales. *See* Sales Verification Rep. (Feb. 15, 2017), P.R. 410 at 1-2. China Steel indicated that the errors only affected its home-market sales data, not its U.S. sales data, and submitted an exhibit explaining the quality code changes. *See* Sales Verification Rep. at 2.

In the Final Determination, Commerce found that "China Steel's incorrect reporting of quality codes shifted home market sales from one unique product group (*i.e.*, matching control number (CONNUM)) to another." Final IDM at 7. This incorrect assignment of quality codes caused the transaction margins for certain *U.S.* sales of products associated with those CONNUMs to be misstated. Final IDM at 7. Having found that China Steel failed to act "to the best of its ability" when complying with Commerce's request for information about the company's quality codes, the Department drew an adverse inference when selecting from among the facts available with respect "to all U.S. sales which match to CONNUMs containing the commercial products at issue." Final IDM at 7. Commerce replaced any transaction margin for a U.S. sale that it found to be distorted with "the highest transaction margin of any U.S. sale of subject merchandise." Final IDM at 7.

CONNUMs . . . for which costs were understated, we have increased the costs for these CONNUMs by substituting the highest reported cost of any CONNUM for the reported cost of these three CONNUMs. Regarding the CONNUMs . . . for which China Steel incorrectly calculated its weighted-average per-unit costs, we have increased the costs for these CONNUMs by substituting the highest reported cost of any CONNUM for the reported cost of the effected [sic] CONNUMs."). Commerce determined that China Steel had not cooperated to the best of its ability "by not providing the Department with timely and accurate cost data for certain CONNUMs" and by misrepresenting "its reported costs in its last two supplemental questionnaire responses by reporting to the Department that it reported actual CONNUM-specific costs for all CONNUMs when there were errors in its reported costs." Final IDM at 29.

## IV.    Allegation of Ministerial Error Regarding DIFMER Adjustment

After the Final Determination was issued, Petitioner and Defendant-Intervenor ArcelorMittal submitted a ministerial error allegation. *See* Letter from David C. Smith to Sec'y Wilbur Ross, Petitioner's Ministerial Error Allegations Concerning China Steel Corporation (Apr. 17, 2017), P.R. 444 ("Pet.'s Letter"). For Petitioner, Commerce's calculated margin for Plaintiff was flawed because Commerce based part of its difference-in-merchandise (DIFMER) analysis on China Steel's original COP1 cost of production database rather than on the AFA-adjusted COP2 database on record. *See* Pet.'s Letter at 3; *See* Mem. Re: Allegation of Ministerial Error for China Steel Corporation (May 19, 2017), P.R. 449 ("Ministerial Error Mem.").

The DIFMER adjustment to normal value is made where identical products are not sold in the United States and the comparison market (or otherwise cannot be compared). *See* 19 C.F.R. § 351.411(a)-(b); *Policy Bulletin 92.2: Differences in Merchandise; 20% Rule*, Enf't &

COMPLIANCE (July 29, 1992), https://enforcement.trade.gov/policy/bull92-2.txt ("Policy Bulletin

92.2"). In order to make an apples-to-apples comparison between products, Commerce looked at

the subject merchandise sold in the United States and compared it to the foreign like product sold

in the comparison (or in this case, home) market that had the most similar *actual* physical

characteristics. *See* Policy Bulletin 92.2; *see also* Pl.'s Br. 39. When selecting the home-market

products to be compared to the subject merchandise, Commerce relied on reported characteristics

(*e.g.*, strength and thickness) to identify the best potential matches. *See, e.g.*, China Steel Final

Programming Mem., Attach. 2, Margin Calculation Log and Output: U.S. Sales Margin Program

(July 11, 2019), C.R. 667 at 37, 46 ("U.S. Sales Margin Program").[13]

   The Department agreed with ArcelorMittal that it had erred in using COP1 data as part of

the basis for the DIFMER adjustment. Commerce recalculated China Steel's products' cost of

manufacturing and the subsequent DIFMER adjustment using only the AFA-adjusted COP2 cost

database. *See* Ministerial Error Mem. at 4-5. Based on ArcelorMittal's allegations and further

findings of its own, on May 25, 2017, the Department published its Amended Final Determination,

calculating a dumping margin of 75.42 percent for China Steel. *See* Amended Final Determination,

82 Fed. Reg. at 24,098.

   Plaintiff filed its rule 56.2 motion for judgment on the agency record on January 12, 2018.

Pl.'s Not. Mot. J. Agency R., ECF No. 47. On April 9, 2018, Defendant and Defendant-Intervenors

---

[13]      A portion of this attachment includes confidential information. *See* "U.S. Sales
Margin Program" at 37, 46 (including sections titled "Concordance Check - Top 5 Possible
Matches for Sample U.S. Models" and "Full Concordance - The Best Model Match Selections,"
which provide numerical values for a number of product characteristics). Having identified the
most similar matches, Commerce then calculated the cost differences associated with the physical
variations between the similar products. *See* U.S. Sales Margin Program at 49 (showing the field
"COSTDIFF" for cost differences between similar products); *see id.* at 66 (showing the field
"DIFMER" next to "COSTDIFF").

filed briefs opposing Plaintiff's motion. *See* Def.'s Resp. Mot. J. Agency R., ECF No. 53 ("Def.'s

Br."); *see also* Def.-Ints.' Resp. Opp'n Mot. J. Agency R., ECF No. 55.

## STANDARD OF REVIEW

The court will sustain a determination by Commerce unless it is "unsupported by

substantial evidence . . . or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## LEGAL FRAMEWORK

Normally, when calculating a dumping margin for products made in a market economy

country, Commerce compares sales of the subject merchandise made in the home market (normal

value based on price) to sales made in the United States (export price). 19 U.S.C. § 1673.

Where Commerce "has reasonable grounds to believe or suspect that sales of the foreign

like product under consideration for the determination of normal value have been made at prices

which represent less than the cost of production of that product," it determines whether home-

market sales "were made at less than the cost of production." 19 U.S.C. § 1677b(b)(1). After the

enactment of the Trade Preferences Extension Act of 2015, Commerce no longer requires an

outside cost of production allegation before it conducts this analysis. *See* Trade Preferences

Extension Act of 2015, Pub. L. No. 114-27, § 505(a), 129 Stat. 362, 386 (2015) ("In an

investigation . . . [Commerce] shall request information necessary to calculate the constructed

value and cost of production . . . to determine whether there are reasonable grounds to believe or

suspect that sales [were made at less than the cost of production]."); *see also* Initiation of

Investigation, 81 Fed. Reg. at 27,093 n.40 ("The Department will no longer require a [cost of

production] allegation to conduct this analysis.").

Upon finding that sales were made at less than the cost of production, Commerce disregards those sales in the determination of normal value if such sales "have been made within an extended period of time in substantial quantities,[14] and . . . were not at prices which permit recovery of all costs within a reasonable period of time." *Id.* § 1677b(b)(1)(A)-(B). When "such sales are disregarded, normal value shall be based on the remaining sales of the foreign like product in the ordinary course of trade," but "[i]f no sales made in the ordinary course of trade remain, the normal value shall be based on the constructed value[15] of the merchandise." *Id.* § 1677b(b)(1).

Constructed value is the total of

the cost of materials and fabrication or other processing of any kind employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of trade . . . [plus] the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country[;] . . . [and] the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the subject merchandise in condition packed ready for shipment to the United States.

---

14      Here, and generally, "substantial quantities" exist where "the volume of such sales represents 20 percent or more of the volume of sales under consideration for the determination of normal value." 19 U.S.C. § 1677b(b)(2)(C)(i).

15      The purpose of using constructed value in this case is not the same as when a product is produced in a nonmarket economy country. *See, e.g.*, *Sigma Corp. v. United States*, 117 F.3d 1401, 1404 (Fed. Cir. 1997); *see also Downhole Pipe & Equip. LP v. United States*, 36 CIT 1509, 1516, 887 F. Supp. 2d 1311, 1320 (2012) (quoting *Shantou Red Garden Foodstuff Co. v. United States*, 36 CIT 53, 57, 815 F. Supp. 2d 1311, 1316 (2012)) ("Commerce ordinarily determines the normal value of subject merchandise of an exporter or producer from a nonmarket economy . . . country 'on the basis of the value of the factors of production utilized in producing the merchandise.'").

*Id.* § 1677b(e)(1)-(2)(A), (3). Because Taiwan is a market economy, Commerce requested cost of production information from the respondent itself rather than constructing cost of production from surrogate values.[16]

"If . . . necessary information is not available on the record, or . . . an interested party or any other person . . . withholds information that has been requested by [Commerce]" or "significantly impedes a proceeding," Commerce uses facts available to calculate normal value. 19 U.S.C. § 1677e(a)(1)-(2)(A), (C). Where Commerce determines that the use of facts available is warranted, it may apply adverse inferences (AFA) if it makes the requisite additional finding that a party has "failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1). "To the best of one's ability" is interpreted by the Federal Circuit to mean "one's maximum effort." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). The question of whether a respondent has cooperated to the "best of its ability" is case-specific, and an AFA rate is not based on the conduct of a "hypothetical, well-resourced respondent." *Nat'l Nail Corp. v. United States*, 43 CIT __, __, 2019 WL 2537931, at *12 (June 12, 2019) (not reported in Federal Supplement). The Federal Circuit has held that "Commerce should consider the overall facts and circumstances of each case, including the level of culpability" and "'the seriousness of the type of misconduct' committed by the uncooperative party" before applying AFA. *BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1301 (Fed. Cir. 2019).

---

[16]     In nonmarket economy proceedings, Commerce's practice in selecting the best available information for valuing factors of production is to "choose surrogate values that represent broad market-average prices, prices specific to the input, prices that are net of taxes and import duties, prices that are contemporaneous with the POR, and publicly available non-aberrational data from a single surrogate market-economy." *Clearon Corp. v. United States*, 37 CIT __, __, 2013 WL 646390, at *3 (Feb. 20, 2013) (not reported in Federal Supplement) (citation omitted).

## DISCUSSION

### I.  Commerce's Amended Final Determination

#### A.  Commerce Acted in Accordance with Law in Rejecting Plaintiff's Unrequested Supplemental Information, and in Drawing Adverse Inferences when Selecting from Among the Facts Otherwise Available

Commerce shall use facts available "[i]f . . . necessary information is not available on the record, or . . . an interested party or any other person . . . withholds information that has been requested by [Commerce]" or "significantly impedes a proceeding." 19 U.S.C. § 1677e(a)(1)-(2)(A), (C). Facts available may also be used if the information provided "cannot be verified" and is therefore unreliable. *Id.* § 1677e(a)(2)(D). Here, in its Preliminary Determination, Commerce found that the data was unreliable because the changes made by China Steel were extensive and unexplained. Prelim. Dec. Mem. at 16 ("Because these unsolicited and unexplained changes [in COP2] are significant and extensive, because they cannot be differentiated from solicited changes [in COP1], and because [cost of production] is integral to the margin calculations, we find that China Steel's reported cost data is unreliable for use in this [P]reliminary [D]etermination.").

Further, when Commerce determines that facts available should be used, and it makes an additional finding that a party has "failed to cooperate by not acting to the best of its ability to comply with a request for information," it may use an adverse inference when "selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b)(1)(A). Commerce looks not only to the objective reasonableness of a party's behavior, but must also

> make a subjective showing that the respondent under investigation not only has failed to promptly produce the requested information, but further that the failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records.

*Nippon Steel*, 337 F.3d at 1382-83; *see Nat'l Nail*, 43 CIT at __, 2019 WL 2537931, at *12 ("[A]

reviewing court must be able to conclude that Commerce looked at the respondent's ability to

comply as well as its performance in complying.").

Here, Commerce determined that China Steel had not cooperated to the best of its ability

by failing to explain adequately the changes it made between COP1 and COP2, and by submitting

those changes, unsolicited, nearly three months after the initial submission. Prelim. Dec. Mem. at

17 (emphasis added) ("China Steel merely stated [that there were newly discovered errors in

COP1] and provided no further explanation. . . . [T]his is an insufficient explanation. Furthermore,

China Steel *had the opportunity to provide its [COP2] cost database on July 28, 2016, but failed*

*to provide these significant changes until October 11, 2016*, as part of an unrelated set of

corrections. By submitting an unexplained and new cost database when it did, China Steel has

prevented the Department from determining, in time for the [P]reliminary [D]etermination, which

set of cost data is reliable.").

Therefore, Commerce found, at the Preliminary Determination stage, that "China Steel

failed to cooperate to the best of its ability by failing to explain the extensive, significant, and

unsolicited changes to its cost database." Prelim. Dec. Mem. at 17. The Department indicated,

however, that it "intend[ed] to issue a supplemental questionnaire after the [P]reliminary

[D]etermination to provide China Steel with an opportunity to explain the changes made to its cost

database." Prelim. Dec. Mem. at 17.

Commerce then sent questions to Plaintiff to obtain information about COP2. *See* Suppl.

Quest. II at 3 ("Based on these coding errors, please answer the following questions pertaining to

the changes made and resulting differences between the cost databases submitted for the

Companies in the September 28, 2016 cost data bases ('COP1') and the revised, October 11, 2016

data bases ('COP2')."). On November 30, 2016, China Steel submitted an explanation of the

differences between COP1 and COP2, as requested, but also submitted a new cost database

(COP3). *See* Rejected COP3 Resp.; Rejection of Unsolicited Database.

Following a request from Petitioner, Commerce rejected the new COP3 information as

untimely, but gave China Steel an opportunity to comply with its prior instructions as to the

differences between COP1 and COP2. *See* Rejection of Unsolicited Database ("China Steel may

refile its November 30, 2016 submission after removing the new 'COP3' cost database and all

references to the information contained in that database . . . ."); *see also* Letter from David C.

Smith to Sec'y Penny Pritzker, Petitioner's Comments on the Nov. 30, 2016 Second Supplemental

Section D Questionnaire Response of China Steel Corporation and Dragon Steel Corporation (Dec.

9, 2016), P.R. 383 at 2 (urging Commerce to reject COP3). In its data filings, China Steel complied

by filing a new response. *See* Final COP2 Resp. As it had in its first COP3 filing dated November

30, 2016, China Steel explained the differences between COP1 and COP2:

> [T]here were three changes between the COP1 and COP2 data files. First, the
> Quality codes were modified for a number of CONNUMs, which resulted in
> changes in production quantities for some CONNUMs and the elimination of other
> CONNUMs (whose production quantity was reduced to zero), as well as the
> addition of new CONNUMs. Second, there was a programming error that resulted
> in a failure to include slab[17] costs in the standard costs for some production line-
> items. And, third, there was a change in the materials cost variance due to the
> increase in standard costs as a result of the inclusion of the additional slab costs.

Final COP2 Resp. at 15-16. In other words, China Steel pointed out how certain "quality codes"

had been mismatched with certain CONNUMs, and how programming errors had led to an

incorrect calculation of standard costs.

---

[17]     According to China Steel, during the course of correcting the "mis-assignment of
quality codes" to certain CONNUMs—an error that had been present in the COP1 data file—China
Steel discovered that it had failed to include the cost of steel slabs in its product costs. The
correction affected cost of production. *See* Final COP2 Resp. at 3.

Although Commerce, in its Preliminary Determination, stated that it had applied "total AFA" to China Steel's data, in the Final and Amended Final Determinations, the Department, as directed by the statute, drew an adverse inference when selecting from among the facts available with respect to some of the cost of production information and the transaction margins of certain U.S. sales. *See* Prelim. Dec. Mem. at 8; Final IDM at 6-7. In other words, Commerce did not apply total AFA in either final determination. As to cost of production information, Commerce applied AFA to certain CONNUMs affected by computer programming errors or for which weighted-average per-unit costs had been misstated. *See* Final IDM at 6-7. With respect to U.S. sales, Commerce applied AFA to a number of sales where China Steel had erroneously reported quality codes, affecting the transaction margins of those sales. *See* Final IDM at 7.

With respect to the misstated CONNUM costs, Commerce substituted "the highest reported cost of any CONNUM for the reported cost of the effected [sic] CONNUMs" to increase the cost. Final IDM at 7.[18]

Concerning China Steel's sales, Commerce applied facts available, with an adverse inference, to some transaction margins of certain U.S. sales for which China Steel had reported incorrect and unverifiable "corrected" codes. Final IDM at 7. Specifically, Commerce applied "the

---

[18]     *See* Cost Calculation Mem. at 1-2 ("We are adjusting the costs of 61 CONNUMS in [the COP2 database] due to what [China Steel] described as an obscure programming error that affected the reported costs of these CONNUMs. . . . We are assigning the CONNUMs affected with the highest reported cost during the POI (*i.e.*, the cost of manufacturing for CONNUM 782111331314022 to these 61 CONNUMs as partial adverse facts available. . . . We are adjusting the cost for three additional CONNUMs that we found at verification to be reported with positive quantities and materials costs, but with negative variable overhead costs [due to an obscure programming error]. . . . For these three CONNUMS (*i.e.*, CONNUMs 782111221514022, 765111221414022, and 760111225314022), we also are assigning the highest reported costs during the POI (*i.e.*, CONNUM 782111331314022) as partial adverse facts available. We note that these three CONNUMs are already included in the list of 61.").

highest transaction margin of any U.S. sale of subject merchandise to all U.S. sales which match

to CONNUMs containing the commercial products at issue. . . ."[19] Final IDM at 7. Therefore, with

respect to the U.S. sales data, AFA was used for only some of China Steel's transaction margins.

### 1.    Commerce Reasonably Rejected China Steel's Unsolicited COP3 Database

The court finds that Commerce's decision not to allow China Steel's submission of the

COP3 database was reasonable because of the timing of the submission in relation to the stage of

investigation. China Steel's submission of COP3 (November 30, 2016), coming as it did more than

two weeks after the Preliminary Determination was issued (November 14, 2016), would have

required Commerce to again determine whether the new data was usable, a clearly necessary

process since China Steel had twice provided information that turned out to be flawed. China

Steel's failure to flag all inaccuracies was again apparent at cost verification, when Commerce

found previously unidentified errors in COP2. *See* Final IDM at 28-29.

Commerce gave China Steel enough chances to satisfy the statute[20] and any sense of

fairness. The Department had been willing to consider the first unsolicited corrections provided by

---

[19]     *See* China Steel Final Analysis Mem. (Mar. 29, 2017), P.R. 443 at 8-10 ("Final
Analysis Mem.") ("[I]nformation collected at verification indicated that QUALITYH [quality
codes] and CONNUMH [matching CONNUMs] were inaccurately reported for certain [home-
market] product codes . . . . Accordingly, . . . as AFA, we are applying the highest transaction
margin of any U.S. sale of subject merchandise to all U.S. sales which match to CONNUMs
containing the commercial products at issue, according to either China Steel's erroneously reported
QUALITYH or to China Steel's 'corrected' QUALITYH.  We accomplished this in a three-step
process.  First we ran the margin program with . . . language inserted . . . to identify the U.S.
CONNUMs affected . . . . Second, we ran the margin program with . . . language inserted . . . to
identify and remove the U.S. CONNUMs affected and calculate the weighted-average margin
based on the other U.S. CONNUMs . . . . Third, we calculated a weighted-average of the margins
calculated based on the affected CONNUMs having the highest transaction margin and on the
weighted-average margin of the remaining CONNUMs.").

[20]     Upon receiving a noncompliant submission in response to its request, the
Department "shall promptly inform the person submitting the response of the nature of the

China Steel (COP2), and to accept China Steel's efforts to harmonize the cost information in COP1

and COP2. Thereafter, China Steel had been provided an opportunity to resubmit the asked-for

explanation of how COP1 and COP2 differed without the unsolicited information contained in

COP3. Commerce's refusal to accept a third cost of production database was reasonable since it

was not seeking new information at the post-Preliminary Determination stage, and, prior to cost

verification, had no way of knowing that COP2 contained more errors than those already

identified. Indeed, the investigation was already well underway by November 30, 2016; more than

five months had passed since the initial questionnaire had been issued and only approximately four

months remained prior to the April 4, 2017 Final Determination. Further, sales verification began

on December 11, 2016, less than two weeks after the November 30 submission of COP3. *See* Sales

Verification Rep. (Feb. 15, 2017), P.R. 410.

    Commerce rejected the unsolicited COP3 database on December 29, 2016, and notified

China Steel that it could resubmit the requested explanations of the COP2 data, excluding the

COP3 database, by January 4, 2017. *See* Rejection of Unsolicited Database. China Steel complied,

resubmitting its response on January 4, 2017. *See* Letter from Jeffrey M. Winton to Sec'y Penny

Pritzker, Response to November 9 Supplemental Questionnaire (Jan. 4, 2017), P.R. 397 at 1

("[W]e have enclosed a revised version of our November 30 submission from which all references

to the [COP3] data file have been redacted."). Cost verification took place from January 9 to 13,

2017. *See* Cost Verification Rep. At verification, Commerce determined that the existence of

errors, previously unidentified by China Steel, made certain CONNUMs and quality codes in the

COP2 submission unverifiable. *See* Final IDM at 28-29; Cost Verification Rep. Accordingly,

---

deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy
or explain the deficiency in light of the [established] time limits." 19 U.S.C. § 1677m(d).

Commerce applied facts available to the erroneously calculated cost of production information and

to the U.S. sales affected by the misstated cost of production information, specifically, the quality

codes and matching CONNUMs. Final IDM at 6-7, 29. Commerce uses facts available when the

information provided "cannot be verified" and is therefore unreliable, or when that party

"significantly impedes a proceeding." 19 U.S.C. § 1677e(a)(2)(C), (D). Therefore, in this instance,

Commerce relied on facts available for certain incorrect CONNUMS and inaccurately reported

quality codes, where China Steel's failure to timely correct errors and clarify its cost data resulted

in the Department's alleged inability to verify the data. Final IDM at 27-29 ("China Steel did not

provide enough information to the Department to indicate that its reporting methodology for these

CONNUMs might be deficient until verification. It was not until [cost] verification that the

Department was aware of these errors. By this time, it was too late to notify China Steel of any

deficiencies, obtain the new data, and examine the methodologies and data for deficiencies.").

Considering the progress of the investigation and the history of China Steel's failing efforts

to get it right, Commerce acted reasonably and in accordance with law when rejecting the new

information contained in COP3.

## 2. Commerce's Application of Adverse Inferences to Cost Data Was Reasonable

If Commerce intends to draw an adverse inference from among the facts available, it may

only do so if it determines that a party has "failed to cooperate by not acting to the best of its ability

to comply with a request for information." 19 U.S.C. § 1677e(b)(1)(A). "It is worth noting that the

subjective component of the 'best of its ability' standard judges what constitutes the maximum

effort that a particular respondent is capable of doing, not some hypothetical, well-resourced

respondent." *Nat'l Nail*, 43 CIT at __, 2019 WL 2537931, at *12. The Federal Circuit has recently

emphasized that Commerce must look not only to respondent culpability but also to the seriousness

of the uncooperative behavior. *See BMW*, 926 F.3d at 1302 ("Commerce must consider the totality

of the circumstances in selecting an AFA rate, including, if relevant, the seriousness of the conduct

of the uncooperative party.").

The Federal Circuit has also held that Commerce should assess whether a party has

complied to the "best of its ability" by considering "whether [the party] has put forth its maximum

effort to provide Commerce with full and complete answers to all inquiries in an investigation."

*Nippon Steel*, 337 F.3d at 1382. While such efforts need not be perfect, the standard "does not

condone inattentiveness, carelessness, or inadequate record keeping." *Id.* Specifically, a party

should

> (a) take reasonable steps to keep and maintain full and complete records
> documenting the information that a reasonable importer should anticipate being
> called upon to produce; (b) have familiarity with all of the records it maintains in
> its possession, custody, or control; and (c) conduct prompt, careful, and
> comprehensive investigations of all relevant records that refer or relate to the
> imports in question to the full extent of the importers' ability to do so.

*Id.*

Here, when determining that an adverse inference was appropriate, Commerce cited China

Steel's repeated failures to timely notify Commerce of errors in its cost data, with respect to the

affected CONNUMs and the quality codes. *See* Final IDM at 29 ("China Steel misrepresented the

nature of its reported costs in its last two supplemental questionnaire responses by reporting to the

Department that it reported actual CONNUM- specific costs for all CONNUMs when there were

errors in its reported costs. . . . China Steel's misrepresentation prevented the Department from

issuing supplemental questions that might otherwise have resulted in changes to the methodology

. . . . We find that China Steel did not act to the best of its ability in reporting costs for certain

CONNUMs."); *see also* Final IDM at 7 ("China Steel's incorrect reporting of quality codes shifted

home market sales from one unique product group (*i.e.*, matching control number (CONNUM)) to

another. . . . [W]e find that China Steel failed to cooperate by not acting to the best of its ability to

comply with a request for information with respect to the full reporting of its quality codes.").

China Steel argues that cooperation to the extent Commerce demands was not possible

under the circumstances. The company points to three typhoons that struck Taiwan as having

affected China Steel's ability to fully reassess its own data. Pl.'s Br. 16. This explanation, however,

does not account for the initial errors in COP1, which was submitted prior to the typhoons. The

errors in COP1 were so extensive that China Steel itself wished to replace it, first with COP2, then

with COP3. *See* First COP2 Resp.; Rejected COP3 Resp. Moreover, China Steel sought and

obtained time extensions to its originally prescribed deadlines for further explanation. *See* Letter

from Erin Kearney to Jeffrey M. Winton, Extension of Time to Submit Supplemental

Questionnaire Responses (Sept. 28, 2016), P.R. 312.

Given the full context of these circumstances, China Steel's arguments are unpersuasive.

Commerce's finding that Plaintiff failed to cooperate to the best of its ability, and its resulting

decision to draw an adverse inference when selecting from among the facts available, was based

on Plaintiff's failure to accurately report data from records that were in its possession. China

Steel's failure to identify errors completely and consistently in information exclusively in its

possession supports a finding that it did not exert its maximum effort (or even much effort at all)

when completing the questionnaire relating to cost data. In its brief, Defendant points out that

"[h]ad China Steel undertaken a more careful review of its [cost] data prior to its initial submission,

or even prior to submission of the corrected database, China Steel could have identified these

additional errors for correction in a timely manner." Def.'s Br. 12. Plaintiff could have "take[n]

reasonable steps" to ensure that its reports were accurate and complete, but Plaintiff did not do so.

*See Nippon Steel*, 337 F.3d at 1382. Further, Plaintiff had more than one opportunity to comply

with Commerce's requests for clarification, but submitted unrequested information in the form of

its new cost databases (COP2 and COP3), even at the verification stage, when Commerce

reasonably limits its acceptance of new information to minor corrections and clarifications. *See,*

*e.g.*, *Maui Pineapple Co. v. United States*, 27 CIT 580, 595-96, 264 F. Supp. 2d 1244, 1257-58

(2003). Here, Plaintiff did not offer new information to assist in verification of information already

on the record, but rather offered the COP3 information as a substitute for existing record

information.

Commerce accepted Plaintiff's substitution of a second, modified cost of production

database (COP2) for the original submission (COP1), and Plaintiff explained and harmonized the

differences between the two databases. After it had issued the Preliminary Determination,

however, Commerce refused to accept and verify a "new" or "corrected," unsolicited cost of

production database (COP3). Commerce must accept new information between the preliminary

and final determination stages if it is reasonable to do so. Commerce's refusal to retrace its steps

in the review process was reasonable here, since China Steel had repeatedly submitted unrequested

cost of production information that Commerce determined was unverifiable, after the deadlines

for submitting such information had passed. The facts of this case demonstrate that China Steel

did not act to the best of its ability when providing information that was exclusively in its custody

and control. Not only did the company fail to provide accurate information in response to the initial

questionnaire (COP1), but it continued to amend its answers in COP2 and COP3, at times without

explanation. These efforts to get things right continued until after sales verification, the

Preliminary Determination, and long after the issuance of the initial questionnaire. The primary

explanation China Steel provided for its failures was the weather.

It is apparent, then, that Commerce's finding that "China Steel failed to cooperate by not acting to the best of its ability to comply with the Department's request for information" satisfies both the factual and legal requirements to support the use of AFA. Final IDM at 29; *see Nat'l Nail*, 43 CIT at __, 2019 WL 2537931, at *12. Therefore, Commerce's decision to use facts available, and to apply an adverse inference when selecting from among those facts, was supported by substantial evidence and in accordance with law.

### B.   Commerce Erred in Using an AFA-Adjusted Cost Database in its Calculation of China Steel's DIFMER Adjustment

Difference-in-merchandise (DIFMER) adjustments apply where identical products are not sold in the United States and in the home market (or otherwise cannot be compared).[21] *See* 19 U.S.C. § 1677b(a)(6)(C)(ii); 19 C.F.R. § 351.411; Policy Bulletin 92.2. Here, the products sold in each market were not physically identical, so Commerce compared the subject merchandise sold in the United States to the Taiwan-market products that had the most similar physical characteristics. Commerce then made an adjustment to normal value for the variable manufacturing costs of physical differences. *See* 19 C.F.R. § 351.411; 1 JOSEPH E. PATTISON, ANTIDUMPING & COUNTERVAILING DUTY LAWS 985 (2017) ("If the variable manufacturing costs are less for the U.S. product, a deduction is made from [normal value]. If the variable manufacturing costs are less for the [comparison market] product, an addition is made to [normal

---

[21]     The normal value statute, 19 U.S.C. § 1677b, permits an increase or decrease "by the amount of any difference (or lack thereof) between the export price or constructed export price and [normal value] . . . that is established to the satisfaction of [Commerce] to be wholly or partly due to . . . the fact [foreign like products are] . . . used in determining normal value." 19 U.S.C. § 1677b(a)(6)(C)(ii); *see* 19 U.S.C. § 1677(16) (foreign like product). Commerce's DIFMER regulation states that "[i]n deciding what is a reasonable allowance for differences in physical characteristics, the [Department] will consider only differences in variable costs associated with the physical differences." 19 C.F.R. § 351.411(b).

value].")). The adjustment is based on actual costs related to physical differences, not on unrelated

cost of production differences. *See* 19 C.F.R. § 351.411; Policy Bulletin 92.2. That is, the costs

Commerce was to take into account were those related to what made the products different—not

those costs related to portions of the product that were the same. The DIFMER adjustment is

calculated on the basis of direct manufacturing costs by assessing three components: (1) materials,

(2) labor, and (3) variable factory overhead. PATTISON at 983; *see also* Policy Bulletin 92.2.

> The Department's policy guidelines set out its method:

> [I]t is important in any consideration of a [DIFMER adjustment] to isolate the costs
> attributable to the difference, not just assume that all cost of production differences
> are caused by the physical differences. When it is impossible to isolate the cost
> differences, we should at least determine that conditions unrelated to the physical
> difference are not the source of the cost differences, such as when different facilities
> are used, or the cost differences are high but the actual physical differences appear
> small. If the costs of the physical difference cannot be isolated or it is not reasonably
> clear that the differences in production cost are related to the physical difference,
> no adjustment should be made.

Policy Bulletin 92.2. "[U]nder Commerce's difmer practice, a finding that the difmer adjustment

to normal value exceeds twenty percent is a presumptive finding that the products may not be

reasonably be compared." *Mitsubishi Heavy Indus., Ltd. v. United States*, 24 CIT 727, 731, 112 F.

Supp. 2d 1170, 1174 (2000) (citing Policy Bulletin 92.2); *see also Mitsubishi Heavy Indus., Ltd.*

*v. United States*, 24 CIT 275, 279, 97 F. Supp. 2d 1203, 1207 (2000), *aff'd*, 275 F.3d 1056 (Fed.

Cir. 2001) (approving Commerce's twenty percent DIFMER rule). When such a finding is made,

it is Commerce's policy to calculate the constructed value of those physically different products

to account for the fact that there are no comparable products. *See* Policy Bulletin 92.2.

> In the Final Determination, Commerce used the cost database COP1 to calculate the U.S.

products' cost of manufacturing, which would be compared to the cost of production of home-

market products to determine whether a DIFMER adjustment was needed. *See* Pet.'s Letter at 2-

4; Ministerial Error Mem. at 3. China Steel submitted COP1 in response to the Department's initial

request for information to be used in its cost of production analysis, but because both the company and the Department identified extensive errors within COP1, it was not used at any other point in Commerce's analysis and determinations. *See* Prelim. Dec. Mem. at 16. Thereafter, Commerce relied on the COP2 adjusted database to calculate its home-market cost of production. *See* Ministerial Error Mem. at 3. As addressed above, in its normal value calculation, Commerce made various adjustments to the COP2 cost database submitted by China Steel, some of which involved the application of an adverse inference (with respect to certain affected CONNUMs and overall reported cost of manufacturing). *See* Final IDM at 6-7.

In reaching its DIFMER conclusions, Commerce first identified which of China Steel's products were similar, but not identical, to each other. *See* U.S. Sales Margin Program at 37, 46. The Department then calculated the cost of manufacturing for those products to find what, if any, costs were quantifiably associated with physical differences between these products, and to determine if the differences could be accounted for with a DIFMER adjustment (*i.e.*, the difference in costs associated with physical differences was not more than twenty percent). *See* U.S. Sales Margin Program at 49 (showing sample numerical cost differences); Ministerial Error Mem. at 4; *see also* Policy Bulletin 92.2 ("We do not make an adjustment because the cost of production is different; we are measuring the difference in cost attributable to the difference in physical characteristics."). For some of the compared products, Commerce determined that a potential adjustment would exceed twenty percent, and thus, the products were too physically different to be compared. *See* Ministerial Error Mem. at 4. This determination was based, in part, on Commerce's use of the COP1 data, although it had not used the COP1 information for any other purpose.

After Commerce issued its Final Determination, Petitioner and Defendant-Intervenor ArcelorMittal submitted a letter claiming that Commerce had made a ministerial error in its calculation of the costs of China Steel's U.S. products, for the purpose of the DIFMER adjustment and "product concordance." Pet.'s Letter at 2-4. ArcelorMittal claimed that Commerce made an error in programming that caused the U.S. costs of manufacturing to be derived from COP1, while home-market costs of manufacturing were derived from COP2. Pet.'s Letter at 4; *see* Ministerial Error Mem. at 3. The use of COP1 for one half of the comparison, Petitioner argued, erroneously reduced Commerce's normal value determination, resulting in an inaccurate final margin for China Steel. Petitioner asked Commerce to "correct the ministerial error that produced an unwarranted reduction to the normal value because of the inadvertent omission of corresponding adjustments to the CONNUM-specific costs for [China Steel's] U.S. sales." Pet.'s Letter at 5.

Commerce agreed with Petitioner that it had made a ministerial error in using the COP1 database, since Commerce had previously found COP1 to be unreliable. *See* Ministerial Error Mem. at 4-6. In its recalculation, Commerce did not use the COP2 data as submitted, however, it used the AFA-adjusted COP2 database for both U.S. products' costs of manufacturing and the home-market products' costs of manufacturing. *See* Ministerial Error Mem. at 5. The use of the AFA-adjusted database apparently caused the difference between a greater number of products to exceed twenty percent, excluding those products from the normal value calculation and yielding an amended weighted-average dumping margin of 75.42 percent for China Steel. *See* Amended Final Determination, 82 Fed. Reg. at 24,097-98; Ministerial Error Mem. at 4-5.

After ArcelorMittal sent its ministerial adjustment letter, but before Commerce readjusted the DIFMER calculation, China Steel objected to Petitioner's position. The

company argued that Commerce had properly assessed the DIFMER adjustment in its initial

determination, basing the adjustment on physical differences, which were ascertainable

precisely because AFA had not yet distorted the cost data. China Steel Resp. to Cmt. Alleged

Ministerial Error (Apr. 21, 2017), P.R. 445; *see also* Pl.'s Br. 40 ("In its initial [F]inal

[D]etermination, however, Commerce calculated the difference-in-merchandise adjustment based

on the costs *before* application of the AFA adjustment. . . . Consequently, Commerce was able to

compare the sales of nearly identical homemarket and U.S. products without distortion."). For

China Steel, "[t]he AFA adjustment that Commerce made to the *costs* for certain products was not

intended to account for specific *characteristics* of those products." Pl.'s Br. 41 (emphasis added).

Further, China Steel claimed that Commerce's adjustment "represented a punishment for [China

Steel's] alleged failure to cooperate," which resulted in a difference between costs based on

Commerce's use of AFA, rather than physical differences between home-market and U.S.

products. Pl.'s Br. 41.

A ministerial error is one "in addition, subtraction, or other arithmetic function, [a] clerical

error resulting from inaccurate copying, duplication, or the like, and any other similar type of

unintentional error which the Secretary considers ministerial." 19 C.F.R. § 351.224(f). Commerce

is permitted to identify and correct ministerial errors, where that error is the sort of clerical,

number-input-related miscalculation that falls under the statutory and regulatory definitions.

*See* 19 U.S.C. § 1675(h). Commerce is not empowered, however, to correct an error in a

manner unsupported by substantial evidence or not in accordance with law. *See generally* 19

U.S.C. § 1516a(b)(1)(B)(i).

Here, both Commerce and China Steel are wrong. First, the DIFMER regulation, 19

C.F.R. § 351.411, says nothing about using information to which an adverse inference has

been applied to determine if a product is identical or similar. And with good reason. Information to which an adverse inference has been applied would distort the results. This is because the application of an adverse inference to facts available says nothing about how one product differs from another; it only speaks to a respondent's *behavior*. 19 U.S.C. § 1677e(b)(1)(A) ("If [Commerce] finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information . . . [Commerce], in reaching the applicable determination under this subtitle . . . may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."). Thus, it does not follow that the use of an adverse inference is lawful when making a determination as to the actual physical comparability of products. Therefore, Commerce erred in its use of an AFA-adjusted database to make the DIFMER comparison.

China Steel's position, however, is also incorrect. The COP1 database is of no use here. China Steel conceded that its COP1 database was not usable, and submitted a new database for Commerce's reliance (COP2). As it was used for all other purposes, the COP2 database must be used for the DIFMER adjustment.

Accordingly, the court remands this matter to Commerce and directs the Department to compute the DIFMER adjustment using information from the COP2 database without the application of an adverse inference.

## II.    Commerce Did Not Err When It Denied Plaintiff's Post-Sale Home-Market Price Adjustment

When calculating normal value based on price, the Department generally uses a "a price that is net of price adjustments." 19 C.F.R. § 351.401(c). These adjustments, however, exclude

post-sale price adjustments "unless the interested party demonstrates . . . its entitlement to such an adjustment." *Id.*

China Steel asked Commerce to recognize a type of billing adjustment it made for its home-market customers. The company made post-sale adjustments if the price it charged its customers for a product subsequently went down during the quarter in which that sale was made. In that event, the customers were given the benefit of the price reduction for products already purchased. *See* China Steel Resp. Suppl. Quest. (Oct. 7, 2016), P.R. 321 at 31 ("Sec. A-C Suppl. Resp."); China Steel Secs. B & C Narrative Resp. (July 28, 2016), P.R. 194, C.R. 240-43, App. B-6 ("B & C Narratives") (referencing the retroactive price adjustments under the field code "BILLADJ7H," one of seven possible billing adjustments). As a respondent, China Steel reported the amount of each retroactive price adjustment in its sales listing by showing a decrease in price after the initial sale. *See* B & C Narratives at 33 ("[B]illing adjustments that decrease the price have been reported as negative amounts."). For China Steel, the BILLADJ7H retroactive adjustment, or rebate, represented a long-established business practice and course of dealing reaching back for at least thirty years. *See, e.g.*, China Steel Rebuttal Br. (Mar. 6, 2017), P.R. 420 at 15.

Commerce determined that China Steel was not entitled to the adjustment in this investigation. The Department did not dispute that China Steel had a business practice of granting rebates, nor that the practice was a long-established one of which its customers were aware. Commerce was not persuaded, however, that the adjustment was the kind that it intended to incorporate in normal value calculations. Final IDM at 46.

When determining a party's entitlement to its claimed adjustment, the Department considers a non-exhaustive list of factors, which have been reduced to regulation, *see* 19 C.F.R. § 351.401(c), as follows:

> *(1) Whether the terms and conditions of the adjustment were established and/or known to the customer at the time of sale, and whether this can be demonstrated through documentation*; (2) how common such post-sale price adjustments are for the company and/or industry; (3) the timing of the adjustment; (4) the number of such adjustments in the proceeding; and (5) any other factors tending to reflect on the legitimacy of the claimed adjustment.

*Modification of Regulations Regarding Price Adjustments in Antidumping Duty Proceedings*, 81 Fed. Reg. 15,641, 15,644-45 (Dep't Commerce Mar. 24, 2016) ("Modification of Regulations") (emphasis added). Commerce weighs these factors singly or in combination. *See id.* at 15,644-45.

While Commerce's regulation does consider a party's established business practice when determining whether to allow a post-sale adjustment, it does not consider this factor to be independently sufficient for entitlement. Commerce "believe[s] that allowing a company to simply show that certain adjustments are part of its standard business practice might permit certain adjustments . . . that have the potential to manipulate the dumping margins." *Id.* at 15,645. As this Court has noted, by "the potential to manipulate . . . dumping margins," Commerce refers to the possibility that companies would grant rebates after it became known that certain sales would be subject to review, thus decreasing an already established sales price, and thus decreasing dumping margins. *See, e.g.*, *Papierfabrik August Koehler AG v. United States*, 38 CIT __, __, 971 F. Supp. 2d 1246, 1255 (2014) (superseded by regulation on other grounds). Commerce itself has also stated that its "purpose" in requiring proof that buyers were "aware of the conditions to be fulfilled and the approximate amount of the rebates at the time of the sale is to protect against manipulation of the dumping margins by a respondent once it learns that certain sales will be subject to review." *Certain Corrosion-Resistant Carbon Steel Flat Products and Certain Cut-to-Length Carbon Steel Plate From Can.*, 61 Fed. Reg. 13,815, 13,823 (Dep't Commerce Mar. 28, 1996).

Disposing of first things first, to the extent that Plaintiff's brief before the court raises new arguments in support of its claimed entitlement to the BILLADJ7H post-sale adjustment, the court

will not address them. These arguments include China Steel's contention that the adjustments it made for its customers were not truly retroactive, and that "circumstances of sales" differing in the United States and Taiwan necessitated the adjustments. *See* Def.'s Br. 19-20; *compare* Pl.'s Br. 42-44, *with* China Steel Rebuttal Br. 14-16, *and* China Steel Case Br. (Feb. 28, 2017), P.R. 414; *see also* Sec. A-C Suppl. Resp. at 31. Because China Steel first made these arguments here, and not to the agency below, they will not be considered by the court. *See* 28 U.S.C. § 2637(d).

In the Final IDM, Commerce primarily based its rationale for rejecting China Steel's post-sale price adjustments on customer knowledge. Commerce concluded that the timeline of the adjustments was inconsistent with a finding that the customers, at the time of sale, knew a sufficient amount about the adjustments to justify their use in Commerce's deliberations: "[T]he terms and conditions of the rebates were not established and/or known to the customer at the time of sale," because "neither the actual rebates, nor the prices on which the actual rebates are based, are set or known by the customer until after the end of the quarter in which the sales occur." Final IDM at 46.

China Steel contests this characterization of its practice as a matter of fact, pointing to documentary evidence showing that "course of dealing" and the "longstanding" nature of its practice made its customers aware that, should they be eligible for a post-invoice price adjustment, they would receive such an adjustment. Pl.'s Br. 44.

For Commerce, the evidence on the record supports no more than a finding that China Steel's customers were generally aware that such a practice existed, and that customers, if eligible, would receive reductions if prices should be reduced later in the same quarter. Final IDM at 46; *see, e.g.*, B & C Narratives, App. B-7-7 (showing a 1987 record of the practice). Commerce found, however, that this evidence was insufficient to show that customers knew "[either] the actual

rebates, [or] the prices on which the actual rebates are based" at the time of sale. Final IDM at 46, 47 ("[W]e find that the terms and conditions of the adjustments were not established and/or known to the customer at the time of sale."). The facts Commerce relied on to reach this conclusion were those showing that price adjustments would not be finalized until after the end of the quarter in which the sales occurred.[22] *See* Final IDM at 46.

Here, China Steel's record evidence, included in its responses to Commerce's questionnaires, indicated that its customers were aware only that China Steel had a policy of giving its customers the benefit of a downward price shift, and that those changes would be retroactively effective for customers when prices for their purchases decreased. Sec. A-C Suppl. Resp. at 31. Company records indicated that the downward shift in price was dependent on the market. *See* B & C Narratives at 33 n.11 ("In accordance with market conditions, [China Steel] may adjust its home-market prices for sales during a quarter sometime after the quarter has already begun."). China Steel does not contend, nor does its evidence support a finding, that (1) its customers were assured of a rebate, or (2) that the amount of a potential rebate was known, or could be ascertained by its customers, at the time of sale.

Commerce does not contest, in the Final IDM, that China Steel's rebates were part of its normal course of business. Rather, Commerce concludes that that fact alone does not equal customer knowledge, because customers could not have known that they would in fact be entitled to such an adjustment or its amount. *See* Final IDM at 46-47 ("[W]e find that the existence of this rebate program as a feature of China Steel's normal practice does not constitute a customer's awareness of any potential rebate at the time prior to sale because the customer does not know

---

[22]         "[[                                                                                ]]." *See* B & C Narratives, App. B-7-8.

whether it will actually receive a rebate on any particular product at the time of such sale. . . .

Record evidence also indicates that neither the actual rebates, nor the prices on which the actual

rebates are based, are set or known by the customer until after the end of the quarter in which the

sales occur."). In other words, Commerce asserts that it would have been necessary for China

Steel's customers to know that they would receive a rebate on a particular product, but since any

rebate was dependent on unknown price changes in the future, whether there would be a rebate,

and its amount, would be unknown at the time of sale.

Commerce's decision to disallow China Steel's post-sale adjustment was reasonable

because of the uncertainty surrounding the company's proposed adjustments. The Department's

concern is that price manipulation can occur after an administrative proceeding is commenced,

where, as here, it is unknown whether there will be a rebate or what the amount of that rebate

would be, at the time of sale. Here, based on the uncertainty of whether the rebates would occur,

and the undetermined amount of the rebates, Commerce found "that the terms and conditions of

the rebates were not established and/or known to the customer at the time of sale." Final IDM at

46. Thus, while China Steel's customers may have been aware that they would receive a rebate of

some amount should prices go down, the amount of the rebate was unknown at the time of sale,

and there is no record evidence that the customers could have calculated it. These unknowns invite

the kind of price manipulation Commerce hopes to guard against. Therefore, it was not

unreasonable for Commerce to believe that China Steel's desired adjustment could be used to

manipulate its dumping margin.


**III.   Commerce's Decision Was Not Biased or Otherwise Impeded by Secretary Ross**

Plaintiff is statutorily entitled to a fair proceeding unimpeded by a decision-maker's

prejudgment under 19 U.S.C. § 1677c (hearings) and 19 U.S.C. § 1677m (submissions). *See NEC*

*Corp. v. U.S. Dep't Commerce*, 21 CIT 933, 946, 978 F. Supp. 314, 326-27 (1997), *aff'd sub nom.*

*NEC Corp. v. United States*, 151 F.3d 1361 (Fed. Cir. 1998) (quoting *Norwegian Nitrogen Prods.*

*Co. v. United States*, 288 U.S. 294, 321 (1933)) ("[The] statute . . . 'command[s] by implication'

that the procedures and hearing be fair."); *see also id.*, 21 CIT at 946, 978 F. Supp. at 327 (holding

that prejudgment would render an antidumping investigation unfair and invalid if "the

decisionmaker has a closed mind at initiation.").

China Steel contends that Commerce's Final Determination was prejudged, and thus

fundamentally flawed, because the appointment and subsequent involvement of Secretary of

Commerce Wilbur Ross created a conflict of interest that invalidated Commerce's decision. *See*

Pl.'s Br. 44-47. China Steel points out that Secretary Ross was a director of ArcelorMittal at the

time that Defendant-Intervenor ArcelorMittal USA LLC, the U.S. subsidiary, filed a petition in

this case.[23] Pl.'s Br. 44. Thereafter, according to Plaintiff, Secretary Ross improperly intervened

when he "publicly announc[ed] the results of [the] investigation that was initiated by

ArcelorMittal's . . . subsidiary." Pl.'s Br. 45. This alleged intervention, along with Secretary Ross's

previously expressed views on Taiwanese steel dumping, form the basis of China Steel's argument

that Secretary Ross's role as decision-maker fatally flawed Commerce's eventual determination.

*See* Pl.'s Br. 46.

The Federal Circuit has held that the bifurcated nature of an antidumping proceeding makes

it difficult for a plaintiff to successfully allege prejudgment and bias. *NEC Corp.*, 151 F.3d at 1373.

A plaintiff "can prevail on its claim of prejudgment only if it can establish that the decision maker

is not capable of judging a particular controversy fairly on the basis of its own circumstances." *Id.*

---

[23]     Plaintiff notes that Secretary Ross, *after* his confirmation, resigned his position as a director and divested from ArcelorMittal. *See* Pl.'s Br. 8.

(citations omitted). Moreover, the Federal Circuit has weighed the earlier stages of the proceeding more heavily when considering the possibility of prejudgment: "The fact that the final decision maker in this case . . . was to a large extent insulated from the earlier machinations within the Department weighs importantly against the fixed mindset thesis." *Id.* at 1374.

Plaintiff's argument rests on Secretary Ross's alleged role as a decision-maker while at Commerce, not in any position he might have held prior to his appointment. As Commerce addresses in its brief, however, the initiation of the investigation itself and Commerce's Preliminary Determination both occurred prior to Secretary Ross's nomination, confirmation, and swearing-in. *See* Initiation of Investigation, 81 Fed. Reg. at 27,089 (dated May 5, 2016); Preliminary Determination, 81 Fed. Reg. at 79,420 (dated November 14, 2016); Def.'s Br. 24 (noting that Secretary Ross's confirmation was on February 27, 2017, and his swearing-in was on February 28, 2017). As to Secretary Ross's role, Commerce contends that he never acted as a decision-maker in this case because the Final Determination was issued under Ronald K. Lorentzen, the then-Acting Assistant Secretary for Enforcement and Compliance. *See* Final Determination, 82 Fed. Reg. at 16,374.

In *NEC Corp.*, the final decision-maker did not oversee the preliminary stages of the relevant investigation, which led this Court to find that it was necessary to determine whether the prior decision-maker had prejudged the outcome of the proceeding in such a way as to constrain the judgment of the final decision-maker. *See NEC Corp.*, 21 CIT at 949, 978 F. Supp. at 330 ("Acting Assistant Secretary Robert LaRussa[, the new decision-maker,] has had only a cursory involvement with the matters in dispute here.").

Here, only one alleged decision-maker's act is under scrutiny. For China Steel, Secretary Ross's appointment, coming as it did during the investigation, after the Preliminary Determination,

and before the Final Determination was issued, made Secretary Ross a decision-maker who

engaged in prejudgment of China Steel's case by announcing the result (via press release) and by

influencing Department officials after his appointment. *See* Pl.'s Br. 30-31 ("Mr. Ross personally

announced Commerce's decision in the investigation that is the subject of this appeal on March 30

. . . . Furthermore, during the period in which Commerce was considering the [F]inal

[D]etermination and the subsequent request to amend that determination, none of the 'political'

positions that ordinarily might have created a buffer between Mr. Ross and the career officials in

Commerce's 'Enforcement and Compliance' agency . . . had been filled.").

      Secretary Ross's role, as described by China Steel, does not actually involve decision-

making, since the press release was issued after the Final Determination was signed by Acting

Assistant Secretary Lorentzen. *See* Final Determination, 82 Fed. Reg. at 16,374; Final IDM at 78

(signed on March 29, 2017); Press Release, Dep't of Commerce, Int'l Trade Adm., Department of

Commerce Finds Dumping and Subsidization in the Investigations of Imports of Certain Carbon

and Alloy Cut-To-Length Plate from Austria, Belg., Fr., Ger., It., Japan, Rep. of Korea, and Taiwan

(Mar. 30, 2017), ECF No. 66-1, Doc. 30. While the optics of the press release might not be good

(it could easily be seen as a victory lap), there is nothing here to suggest that Secretary Ross

actually affected the outcome of the investigation.[24]

---

[24]    China Steel also contends that Secretary Ross violated Federal Ethics Regulation
5 C.F.R. § 2635.502 (2017), which directs employees who "know[] that a particular matter
involving specific parties is likely to have a direct and predictable effect on the financial interest
of . . . [a]ny person for whom the employee has, within the last year, served as . . . director" to
refrain from "participat[ing] in the matter unless" the relevant agency (here, Commerce) authorizes
them to do so. 5 C.F.R. § 2635.502(a), (b)(iv). This matter is outside the scope of the court's
review.

China Steel's remaining arguments, insofar as they attempt to establish Secretary Ross's anti-Taiwan bias and inappropriate influence over other officials of Commerce, are not supported by substantial evidence. The Federal Circuit has made clear that the risk of bias and prejudgment in antidumping investigations is difficult for a plaintiff to prove. *NEC Corp.*, 151 F.3d at 1374 (quoting *Withrow v. Larkin*, 421 U.S. 35, 57 (1975)) ("We are particularly reluctant to hold Commerce to [a] stringent prejudgment standard . . . . [I]t is not uncommon for Commerce to modify its position between the preliminary determination and the final determination. Therefore, in an antidumping investigation, '[t]he risk of bias or prejudgment in this sequence of functions has not been considered to be intolerably high or to raise a sufficiently grave possibility that the adjudicators would be so psychologically wedded to their complaints that they would consciously or unconsciously avoid the appearance of having erred or changed position.'"). Moreover, with regard to Secretary Ross's statements criticizing the Taiwanese steel industry, "[i]t is well established that '[a]dministrators . . . may hold policy views on questions of law prior to participating in a proceeding.'" *In re Nat'l Security Agency Telecomm. Records Litig.*, 671 F.3d 881, 900 (9th Cir. 2011) (citations omitted); *see also id.* (citing *Withrow*, 421 U.S. at 47) ("[E]xpressing an opinion, even a strong one, on legislation, does not disqualify an official from later responding to a congressional mandate incorporating that opinion.").

Secretary Ross's appointment does not compel the conclusion that he was involved in reaching the Final or Amended Final Determination in this case. Nor does his appointment invalidate the process by which Commerce reached its conclusions as to China Steel's submissions and eventual margin. In the absence of any evidence showing improper control by Secretary Ross over this investigation, the court does not find that Commerce's determination in this case was flawed by prejudgment or bias.

## CONCLUSION and ORDER

Commerce's use of the COP2 cost database, with the application of AFA, as the basis for its difference-in-merchandise (DIFMER) adjustment to normal value is not in accordance with law. That is, the law does not support the use of adverse inferences when calculating costs specifically related to the physical differences of some of China Steel's products. Therefore, it is hereby

**ORDERED** that the Amended Final Determination is sustained in part and remanded; it is further

**ORDERED** that, on remand, Commerce issues a revised Amended Final Determination that complies in all respects with this Opinion and Order, is based on determinations that are supported by substantial record evidence, and is in all respects in accordance with law; it is further

**ORDERED** that, on remand, Commerce shall compute the DIFMER adjustment to normal value using information from China Steel's final COP2 cost database, without the application of an adverse inference, and may use facts available in filling in missing or replacing unverifiable necessary information; and it is further

**ORDERED** that the revised Amended Final Determination shall be due ninety (90) days following the date of this Opinion and Order; any comments to the revised Amended Final Determination shall be due thirty (30) days following the filing of the revised Amended Final

Determination; and any responses to those comments shall be filed fifteen (15) days following the

filing of the comments.

 

 

                                                                                          /s/ Richard K. Eaton

                                                                          Richard K. Eaton, Judge

Dated:           August 6, 2019
                   New York, New York